IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-64 |
| | ) | |
| ESTHER ELIZABETH MCCALEBB-PIPPENS,) | | (PHILLIPS/GUYTON) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Esther Elizabeth McCalebb-Pippens' Motion to Suppress [Doc. 231], permitted [Doc. 217] to be filed on March 23, 2010. The Court held an evidentiary hearing on this motion on April 23, 2010. Assistant United States Attorney Tracy L. Stone represented the Government. Attorney Charles T. Webber, Jr., appeared on behalf of the Defendant, who was also present. The Court took the motion, the related filings, and the evidence under advisement on April 24, 2010.

### I. POSITIONS OF THE PARTIES

The Defendant stands indicted [Doc. 78] on a single count of conspiracy to distribute or to possess with the intent to distribute heroin from October 2008 to May 15, 2009. The Defendant argues [Docs. 230 and 231] for the suppression of all evidence gained from the February

1

19, 2009 search of her fiancé's rental car because she contends that the searching officers violated the Michigan State Police inventory policy. She asserts that she had an active Michigan driver's license in her possession at the time of the stop. Thus, she concludes that the inventory policy required the officers to allow her to take possession of the car upon her fiancé's arrest. She maintains that the inventory policy places the burden on the officers to explore the release of a vehicle to other authorized drivers before conducting an inventory search.

The Government responds [Doc. 222] that Defendant McCalebb-Pippens did not have a valid driver's license at the time of the stop. Moreover, it contends that Defendant Thompson-Bey did not ask that the rental car be released to McCalebb-Pippens and that she was not listed as an authorized driver on the rental agreement. Thus, it maintains that the officers properly impounded the car.

## II. SUMMARY OF THE TESTIMONY

At the April 23, 2010 evidentiary hearing, the defense presented the testimony of Defendant Esther Elizabeth McCalebb-Pippins. The Defendant testified that she is a resident of Detroit, Michigan. She identified her Michigan driver's license [Exhibit 1], which bears an expiration date of February 16, 2011, but does not state the date it was issued. She said that she had this driver's license in her possession on February 19, 2009, and it was active at that time. She also identified a copy of her Michigan driving record [Exh. 2], which showed that on February 19, 2009, her driver's license was not suspended.

On cross-examination, the Defendant testified that she was a passenger in the Hertz rental car driven by Codefendant Ronald Thompson-Bey on February 19, 2009. She was not listed

2

as a driver on the rental agreement for that car. She stated that her driver's license, which she had with her on February 19, 2009, would have been issued in 2007. At the time of the stop, her driver's license was in her wallet inside of her purse, which was on the front floorboard. Although she initially stated that a state trooper did not come to the car window and request the occupants' driver's licenses, upon viewing a video recording [Exh. 3] of the stop, she agreed that the trooper came to the car window and asked the driver for his driver's license. She agreed that the recording reveals that the trooper then asked if either she or the other passenger had identification or driver's licenses. She testified that at that point, she gave the trooper her driver's license and that it was the same license that was marked as Exhibit 1. She said that twenty to thirty minutes after the initial stop, she complained about being cold and was placed in the front seat of a police SUV, while handcuffed. At that time, the officer would not allow her to return to the rental car to get her driver's license. Instead, the officer asked for her name and entered it into his in-car computer but said that he could not find her.

On redirect examination, the Defendant testified that when she gave her driver's license to the trooper who first approached the car during the stop, he looked at her license and gave it back to her. Later, when a different trooper entered her name into his computer, he told her that he could not find her in the system. At that time, her driver's license was still in the rental car, but she was not allowed to go back to the car. She said that her driver's license remained in the rental car when it was towed, and she did not get it back until the following day.

On recross-examination, the Defendant stated that the following day, February 20, 2009, she went to Hertz and paid the towing fee on the rental car. Then, a Hertz representative accompanied her to a private towing company's lot, where she retrieved her purse and her driver's

3

license from the rental car. She did not go to a branch office of the Michigan Secretary of State to get a new driver's license on February 20, 2009, or on June 8, 2009. She confirmed that the driver's license that was Exhibit 1 in the record was the same license that she physically retrieved from the impound lot on February 20, 2009.

The Government called Trooper John Robe of the Michigan Department of State Police. Trooper Robe testified that on February 19, 2009, he conducted a traffic stop of a car in which the Defendant was a passenger. He acknowledged that he had previously testified about that traffic stop in an earlier hearing. He stopped the car for following too closely and identified the driver as Ronald Thompson-Bey from his driver's license. He asked the female passenger in the front passenger's seat for a driver's license or identification card but she did not provide one. She was verbally identified as Esther McCalebb-Pippens. The rear passenger was identified as John Smith from his Michigan identification card. Trooper Robe handed Thompson-Bey's driver's license and Smith's identification card to his partner Trooper Kiser, who typically conducted the computer checks and completed the paperwork when they worked together. Trooper Robe's police report from that night states that the Defendant was verbally identified and that Thompson-Bey was identified from his driver's license and Smith was identified from his identification card.

Trooper Robe said he was certain that if the Defendant had given him her driver's license, he would not have returned it to her without running a computer check on her. In his experience in conducting numerous traffic stops, people sometimes give a false name when they are stopped. He also stated that when searching a car, he looks for anything that can substantiate the identities of the occupants. He said that he had received training in the investigation of false driver's licenses due to a widespread problem with them in the community where he worked. Because of

4

these concerns, he would always check the validity of an identification when he stopped a car unless it was an emergency situation.

Trooper Robe testified that pursuant to the inventory policy of the Michigan State Police, a licensed passenger shall be allowed to take custody of a vehicle if the driver is subject to a custodial arrest and if the driver authorizes it, as long as that passenger can take custody without violating any laws. At the time of the February 19, 2009 stop, no one asked Trooper Robe if Defendant McCalebb-Pippens could take control of the car. Moreover, Trooper Robe stated that the Defendant could not take custody of the car because it would not have been legal for her to drive it. Section 257.311(a) of the Michigan law requires drivers to have their driver's license in their possession at all times when they are driving and to display the license to a police officer upon demand.

Trooper Robe stated that shortly after Thompson-Bey and Smith gave him their identification, they also gave him the rental agreement for the car. Later in the stop, Trooper Robe searched the passenger compartment and trunk of the rental car. He stated that he would have also searched the purse in the front passenger compartment at that time and that he would have looked for a driver's license or identification in the purse. Trooper Robe did not find the Defendant's driver's license during the search of the car.

On cross-examination, Trooper Robe testified that Trooper Kiser was the officer who ran a computer check on the Defendant's name. A third officer came to the scene later. Trooper Robe stated that the video recording of the stop shows him looking at the rental agreement shortly after approaching the car. He stated that he only asked the Defendant for her driver's license or identification once. Although he could not recall her exact words, he thought that she responded that

5

she did not have one. He did not recall Trooper Kiser ever asking the Defendant for a driver's license.

On redirect examination, Trooper Robe stated that his police report [Exh. 5] did not contain the Defendant's driver's license number. He said that he learned her driver's license number later that night after the traffic stop, when another officer ran a computer check, but he mistakenly did not include it in his report. The Defendant was taken to a police station after the traffic stop, a thorough check of her background information was conducted, and her driver's license number was gained. He stated that he did not know if that check revealed anything about the status of her driver's license.

On recross-examination, Trooper Robe stated that in order to identify the Defendant at the scene, he typically would have gotten her name and ran it on the computer, talked with her perhaps about her driver's license history, and talked to the other occupants of the car to determine what name and age they gave for her. He agreed that he might of talked with the Defendant to learn her name and address and then turned that information over to Trooper Kiser to run a background check on the computer.

The Government next called Trooper Matthew Kiser of the Michigan State Police Department, who testified that he was in his fifteenth year of service as a state trooper. He stated that the Defendant was a passenger in a car that he and Trooper Robe stopped on February 19, 2009. During the first five minutes of the traffic stop, he provided security for Trooper Robe and conducted computer checks on any identification cards that Trooper Robe obtained. He was given a driver's license for the driver Thompson-Bey and a Michigan identification card for the rear passenger Smith, but he did not receive any type of identification for the Defendant. He assisted in

6

the search of the rental car's trunk and found no driver's license for the Defendant during that search. He did not take any information from the Defendant that night.

Trooper Kiser stated that a motor-carrier officer subsequently arrived on the scene, and the Defendant was allowed to get into that police vehicle because of the cold weather. Although he did not know what went on inside that vehicle, typically a motor-carrier officer gets the name and birth date of the person he is transporting to create a record of his actions. The motor-carrier officer transported the Defendant to the Monroe state police post. Although Trooper Kiser did not have any direct contact with the Defendant at the post, at some point, she was identified, found to have no outstanding warrants, and released.

Trooper Kiser testified with regard to the Defendant's driver's license, which was Exhibit 1. He stated that on its face, Exhibit 1 appeared to be a valid Michigan driver's license with an expiration date of February 16, 2011. He explained that a code at the bottom left of the license reveals when that physical license was issued. He stated that he had been trained in interpreting this code. Trooper Kiser testified that the code revealed that this physical license was issued on June 8, 2009, and that it was a duplicate, meaning that the license had been reissued during the four years it was valid. Thus, he concluded that this physical driver's license did not exist on February 19, 2009, and that the Defendant could not have had it in her possession on that date.

Trooper Kiser explained a spreadsheet [Exh. 6] documenting the driver's licenses issued to the Defendant. The spreadsheet reveals that the Defendant also sought a duplicate or replacement driver's license on February 20, 2009, the day after the traffic stop. It also shows that the Defendant renewed her driver's license on February 6, 2007, and that this new license was due to expire on February 16, 2011. This is the driver's license that would have been in existence at the

7

time of the traffic stop.

With regard to the Defendant's driving record [Exh. 2], Trooper Kiser stated that if a party receives a citation and fails to appropriately address it, his or her driver's license will be suspended. When the party remedies the reason for the suspension, by paying a fine, etc., the suspension is terminated and the driver's license is reinstated. Trooper Kiser said that the Defendant's license was suspended in April 2008 and that the suspension was terminated about one week later. Thus, he concluded that the Defendant's driver's license issued on February 6, 2007, would have been a valid license on February 19, 2009.

On cross-examination, Trooper Kiser testified that from the Defendant's driving record and the image retrieval record [Exhibit 9], which shows the picture of the Defendant that was on her February 6, 2007 driver's license, he could tell that she had an active driver's license on February 19, 2009. This license would have been valid on that date, if she had it in her possession. Trooper Kiser stated that the Defendant never told him that her identification was in the rental car during the traffic stop or, conversely, that she did not have a driver's license in her possession that night. She did ask to reenter the car while they were searching it, but she did not give a reason for wanting to do so.

On redirect examination, Trooper Kiser stated that when a driver of a rental car is arrested and an another driver, authorized in writing to drive the car, is not available, all the major car rental companies do not want the car turned over to a third party. Instead, the rental companies want the car to be impounded. The car involved in the February 19, 2009 traffic stop was a Hertz rental car. When the driver, Thompson-Bey, who was listed as the sole authorized driver on the rental agreement, was arrested, the car was impounded. On recross-examination, he stated that he

8

did not speak to anyone from the Hertz rental company on the night of the traffic stop. He explained that he did not call the rental company because he had the rental agreement, which showed no additional drivers were authorized.

The defense recalled the Defendant, who testified that she "probably" lost her driver's license that was issued February 6, 2007, although she could not recall when. She stated that she got her driver's license that was Exhibit 1, after her car was stolen with her purse and driver's license in it.

The Defendant stated that when she got in the police vehicle a uniformed officer, who was not Trooper Kiser, ran a computer search on her. She told him that if he needed her identification, it was in her purse, which was still in the rental car. He said that it was not necessary for him to have her identification but that all he needed was her name and social security number. Once he entered that information into the computer, he said that he had found her. She did not speak with any of the other officers on the scene about getting her driver's license from the car. The Defendant said that when she retrieved her purse the next day, her wallet and driver's license were missing.

On cross-examination, the Defendant testified that she could not recall every time that she had replaced her driver's license. She said that she had lost her driver's license "numerous" times because she always leaves her purse in her car, from whence it is frequently stolen. She agreed now that Exhibit 1 was not the driver's license that she had in her possession at the time of the traffic stop. She said that she got a new driver's license once she discovered that her license was missing from her purse on February 20, 2009. She said that her 1994 Chrysler Sundance was stolen from Springarden Street, Detroit, Michigan. Although she initially testified that the police did not

9

investigate the theft, she later stated that she reported the theft to the Detroit police, but they could not search for the car because it had an unregistered Tennessee license plate. The Defendant testified that a few months later, her nephew spotted her Sundance on a tow truck while he was riding on the school bus and called her. She went to the towing company, paid the fee, and got her car back sometime in January 2010. The Defendant believed that the theft of her car could have been the cause for her most recent replacement of her driver's license, which resulted in her getting Exhibit 1.

### III. FINDINGS OF FACT

The Court makes the following factual findings based upon the evidence presented at the November 3, 2009 suppression hearing of Defendant Thompson-Bey's suppression motion and the April 23 suppression hearing relating to Defendant McCalebb-Pippen's suppression motion: On February 19, 2009, Trooper John Robe and his partner Trooper Matthew Kiser conducted a traffic stop on a Hertz rental car driven by Ronald Thompson-Bey. Defendant Esther Elizabeth McCalebb-Pippens was the front seat passenger in that car. Trooper Robe approached the car and asked the driver for his driver's license, which Thompson-Bey produced. He then asked the Defendant and the backseat passenger for their driver's license or identification. The Defendant did not produce any type of identification. The backseat passenger John Edward Smith gave Robe a Michigan identification card. Trooper Robe handed Thompson-Bey's driver's license and Smith's identification card to his partner Trooper Kiser. The occupants also gave Robe a rental agreement from the Hertz rental agency that listed Thomson-Bey as the sole authorized driver of the car.

Trooper Kiser conducted a computer check on the identification provided and learned that the Thompson-Bey had an outstanding arrest warrant for a felony drug charge and that Smith's

10

driver's license was suspended. Trooper Robe subsequently arrested Thompson-Bey on the warrant, handcuffed him, and placed him in the back of Robe's patrol car. The troopers conducted a search of the rental car but did not find the Defendant's driver's license during the search. They discovered crack cocaine in a piece of luggage, which they identified as belonging to Smith because it also contained prescription pill bottles addressed to him. The officers arrested Smith at that point. Another piece of luggage contained a clear Ziplock bag holding prescription pill bottles bearing the Thompson-Bey's name and drugs that the officers believed were heroin and Oxycontin.

During the course of the traffic stop and search, the Defendant complained that she was cold and was allowed to sit in the front of a police SUV. The motor-carrier officer driving that vehicle requested the Defendant's name and identifying information and ran a computer check on her. The rental car was towed to a private impound lot. The Defendant was transported to a Michigan State Police post, where it was determined that she had no outstanding warrants, and she was released. At that point, an unidentified officer also learned her driver's license number.

Although the Defendant had a valid Michigan driver's license at the time of the stop, she did not have it physically with her on her person or in her purse on February 19, 2009.

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant challenges the warrantless search of the rental car in which she was a passenger, contending that the searching officers did not comply with the Michigan State Police inventory policy in conducting the search. She argues that the inventory policy placed an affirmative duty on the officers to release the rental car to her, because she had a valid driver's

11

license and her custody of the car would not have violated any law.

## A. Expectation of Privacy in Rental Car

Although not addressed by either party, the Court turns first to the question of whether the Defendant had a legitimate expectation of privacy in a rental car in which she was a passenger but not an authorized driver on the rental agreement. The Court of Appeals for the Sixth Circuit has recognized that "'[b]ecause Fourth Amendment rights are "personal," the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized.'" United States v. Waller, 426 F.3d 838, 843 (6th Cir. 2005) (quoting United States v. King, 227 F.3d 732, 743 (6the Cir. 2000), in turn quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978)). Thus, the Court must address the issue of standing[1] *sua sponte*.

The Fourth Amendment rights of a passenger in a vehicle that is stopped and searched are limited to those personal to that individual. In Brendlin v. California, the United States Supreme Court recognized that a passenger riding in an automobile that has been pulled over has him- or herself been seized and, thus, has a reason to challenge the stop of the vehicle. 551 U.S. 249, 251, 259 (2007); United States v. Torres-Ramos, 536 F.3d 542, 549 (6th Cir. 2008) (holding that passengers could only object to the evidence seized from the van as the fruit of an unlawful *stop* vs. and unlawful search). Passengers also have the right to challenge the search of their own person occurring during a traffic stop, see, e.g., United States v. Garcia, 496 F.3d 495, 504 (6th Cir. 2007),

---

[1]The Supreme Court actually "rejected the concept of 'standing'" in Rakas in favor of a showing of a legitimate expectation of privacy. United States v. Smith, 263 F.3d 571, 581 (6th Cir. 2001). The term "standing" is now commonly used to refer to the threshold determination of whether an individual has a legitimate expectation of privacy such that they may properly bring a Fourth Amendment challenge to allegedly unconstitutional police conduct. Id. at 581-82.

and of their luggage located in a car that is not their own, see Waller, 426 F.3d at 844-45. Here, the Defendant does not challenge the initial stop of the rental car or any search of her person or luggage. The testimony at the November 3 suppression hearing shows that the contraband was seized from the luggage of Thompson-Bey and the other passenger Smith. Additionally, Trooper Robe's police report, introduced as an exhibit at both suppression hearings, states that following advise and waiver of her Miranda rights, the Defendant stated that she did not know anything about the items that were located in the trunk of the rental car and had not seen them before. See United States v. Tolbert, 692 F.2d 1041, 1045 (6th Cir. 1982) (observing that defendant who "disclaims any interest in luggage thereby disclaims any concern about whether the contents of the luggage remain private").

Case law firmly establishes that passengers do not have a legitimate expectation of privacy with regard to the search of a vehicle that does not belong to them. Rakas v. Illinois, 439 U.S. 128, 148 (1978) (holding that defendants had no legitimate expectation of privacy in the glove compartment or area beneath the seats in a car in which they were merely passengers); Torres-Ramos, 536 F.3d at 549 (holding that the passengers lacked standing to challenge the search of the van in which they were were riding). Moreover, and particularly relevant to this case, passengers do not have standing to challenge the search of a rental car for which they are not listed on the rental agreement as an authorized driver. United States v. Pino, 855 F.2d 357, 360-61 (6th Cir. 1988) (holding that a passenger in a rental car lacks standing to contest the search of the car when the passenger is not on the rental agreement); c.f. United States v. Smith, 263 F.3d 571, 582-83 (concluding that the validly licensed driver of a rental car had standing to challenge the search of the rental car even though he was not listed on the rental agreement). In the present case, the Defendant was a passenger in a Hertz rental car. It is undisputed that the driver Ronald Thompson-

Bey was the only authorized driver on the rental agreement. Accordingly, the Court finds that the Defendant does not have a legitimate expectation of privacy in the rental car and, therefore, lacks standing to challenge the inventory search thereof. The Court recommends that the Defendant's Motion to Suppress [Doc. 231] be denied.

### B. Propriety of the Inventory Search

In the event that the District Court determines that the Defendant does have standing to contest the search of the Hertz rental car, the Court turns to the Defendant's argument that the Michigan State Police inventory policy required the troopers to release the rental car to her. In order for the instant search to pass Fourth Amendment muster, it must fall within one of the narrowly drawn exceptions to the warrant requirement. See Katz v. U.S., 389 U.S. 347, 357 (1967) (holding that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions"); Jones v. U.S., 357 U.S. 493, 499 (1958) (observing that "[t]he exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn"). This Court has previously found [Doc. 170] that the car was properly searched and the drugs were properly seized pursuant to an inventory search of the car prior to its impoundment.

An inventory search must proceed pursuant to "standardized criteria" or "established routine" in order to protect against the use of inventory searches as "a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990). Part of the reasoning behind admitting evidence discovered in an inventory search is that such searches are part of routine police procedures and, thus, not arbitrarily used as an investigative tool. See Colorado

14

v. Bertine, 479 U.S. 367, 372-73 (1987). Like her Codefendant Thompson-Bey,[2] the instant Defendant argues in essence that the Michigan troopers failed to comply with their inventory policy. The relevant portion of the Michigan State Police inventory policy states as follows: "When the driver of a vehicle is subjected to a custodial arrest and separated from the vehicle, a properly licensed passenger shall be allowed to take custody of the vehicle (with the authorization of the driver) as long as the passenger would not violate any law by doing so."

The Defendant contends that the troopers' failure to completely investigate the validity of her driver's license erroneously resulted in the impoundment of the rental car and the inventory search. She argues that the inventory policy required that upon the driver's arrest, the officer must release the car to a properly licensed passenger if the officer has the driver's authorization and the release would not violate any law. She asserts that she had a valid driver's license at the time of the stop and that it was incumbent upon the officers to ask Thompson-Bey to authorize the release. Finally, she maintains that although the release of the car to her might have been contrary to the rental agreement with Hertz, it would not have violated any law.

The Court finds that the troopers properly did not release the Hertz rental car to the Defendant because she could not have driven the car without violating Michigan law. Although the proof at the evidentiary hearing revealed that Defendant was licensed to drive at the time of the stop,

---

[2]Defendant Thompson-Bey also argued that the officers failed to comply with the inventory policy by not permitting the occupants to contact a third party to collect the rental car and by not recording the inventory on the appropriate form. The Court found [Doc. 170, pp. 21-23] that the policy made the decision to release to a non-passenger discretionary and that the troopers had a legitimate, non-investigatory reason for not allowing the occupants to contact a third party (namely, that the rental companies preferred impoundment to release to a driver not listed on the rental agreement). The Court found the documenting of the inventory on a police report rather than the appropriate form to be a ministerial violation occurring after the inventory search and having no bearing upon the validity of the search at the time it occurred.

she did not have her driver's license with her. The Defendant's assertion that she had her driver's license with her on February 19, 2009, and that she showed her driver's license to Trooper Robe is not credible. Trooper Robe testified that he asked for her driver's license but that she did not have one. The video recording of the stop confirms that he asked the passengers for a driver's license or an identification card. Trooper Robe testified that if the Defendant had provided a driver's license to him, he would have given it to Trooper Kiser for a computer check. This is precisely what he did with Thompson-Bey's driver's license and the rear passenger Smith's identification card. Trooper Kiser corroborated this testimony with his own testimony that he did not receive the Defendant's driver's license from Trooper Robe. Additionally, Trooper Robe searched the passenger compartment of the rental car and did not find the Defendant's driver's license during that search. Trooper Robe testified that he would have searched the Defendant's purse for identification. Accordingly, the Court finds that the Defendant did not have a driver's license physically at the scene on February 19, 2009.

Michigan law provides that "[t]he licensee shall have his or her operator's or chauffeur's license, or the receipt described in section 311a, in his or her immediate possession at all times when operating a motor vehicle, and shall display the same upon demand of any police officer, who shall identify himself or herself as such." Mich. Comp. Laws §257.311. Trooper Robe testified that he could not release the rental car to the Defendant because she did not have a driver's license and would have been in violation of this law. Accordingly, the inventory policy did not permit the troopers to release the rental car to the Defendant, who could not have driven the car without violating Michigan law. The Court continues to find that the officers properly conducted an inventory search of the rental car prior to its impoundment.

16

## V. CONCLUSION

After carefully considering the evidence, the parties' arguments, and the relevant legal authorities, the Court finds that the Defendant does not have a legitimate expectation of privacy in the rental car that would permit her to challenge the inventory search thereof. The Court also finds no basis to suppress the evidence resulting from search of the rental car. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's suppression motion [**Doc. 231**] be **DENIED**.[3]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).